# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**TIERRA BLANCA RANCH HIGH COUNTRY**
**YOUTH PROGRAM, SCOTT CHANDLER,**
**COLETTE CHANDLER, AND BRYCE HALL,**

     **Plaintiffs,**

     **v.**                                    **15-cv-00850 MCA/KRS**

**FELIPE GONZALES,**

     **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant Felipe Gonzales' (Defendant's) *Motion for Summary Judgment.* [Doc 91] Plaintiffs Tierra Blanca Ranch High Country Youth Program (the Ranch or the Program), Scott Chandler (Scott), Colette Chandler (Colette), and Bryce Hall (Hall) (collectively, Plaintiffs) responded and requested additional discovery under Rule 56(d). [Doc. 94] After Defendant's *Reply* was filed [Doc. 95], Plaintiffs filed a *Motion for Sur-Reply to Defendant's Motion for Summary Judgment.* [Doc. 97] This matter is further before the Court on Plaintiffs' *Motion for Spoliation Sanctions against Defendant.* [Doc. 101]

The Court has considered the parties' submissions and the relevant law, and is otherwise fully informed. For the following reasons, the Court **GRANTS in part** and **DENIES in part** Defendant's *Motion for Summary Judgment* [Doc. 91]. The Court **DENIES** Plaintiffs' *Rule 56(d) Request for Time to Conduct Discovery* [Doc. 94] and

Plaintiffs' *Motion for Sur-Reply to Defendant's Motion for Summary Judgment* [Doc. 97]. The Court also **DENIES** without prejudice Plaintiffs' *Motion for Spoliation Sanctions against Defendant.* [Doc. 101]

## I.     Background

In September 2015 Plaintiffs filed a *Complaint* alleging deprivation of their constitutional rights under 42 U.S.C. § 1983.[1] [Doc. 1] Plaintiffs alleged that Defendant "used deceit and intimidation to obtain consent to search their business premises and subject them, participants and staff to prolonged detention and interrogation with the intent and result of depriving Plaintiffs of rights arising under the Fourth and Fourteenth Amendments of the United States Constitution in violation of 42 U.S.C. § 1983." [Doc. 1] Plaintiff Hall also alleged a violation of his First Amendment right to association. [Doc. 1] An *Amended Complaint* was filed in December 2015. [Doc. 6 (*Amended Complaint*)] Defendant answered [Doc. 10] and filed a *Motion to Dismiss Plaintiff Bryce Hall.* [Doc. 11] Plaintiffs responded to the *Motion to Dismiss* [Doc. 19] and filed a *Motion to File Second Amended Complaint.* [Doc. 30] On March 20, 2017, this Court granted the *Motion to File Second Amended Complaint* and granted in part Defendant's *Motion to Dismiss Plaintiff Bryce Hall*, dismissing Hall's First Amendment claim. [Doc.

---

[1] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.

75]  Discovery was stayed pending resolution of Defendant's *Motion for Summary Judgment.* [Doc. 63]

Plaintiffs allege in the *Second Amended Complaint* that the Program "is a privately funded program for troubled youths that provides a simple ranch life with the goal of helping troubled teenagers turn their lives around." [Doc. 76, ¶ 11]  They further allege that Hall was enrolled in the Program at the time of the events at issue, Scott is an owner and director of the Program and Colette owns a community property interest in some of the Program. [Doc. 76, ¶¶ 5-7]  At all material times, Defendant was employed by the New Mexico State Police. [Doc. 76, ¶ 8]

The following facts are undisputed.  In either January or May, 2013, Defendant began investigating allegations of child abuse of youths enrolled in the Program. [Doc. 91, ¶ 2; Doc. 94, ¶ 2]  In September 2013, a resident of the Program was killed in a car accident while riding in a vehicle driven by a Program staff member. [Doc. 94, SAMF ¶ 4; Doc. 91, ¶ 10; Doc. 95]  A few days after the accident, Defendant contacted Scott to arrange to question people at the Ranch. [Doc. 91, ¶ 9; Doc. 94, ¶ 4, SAMF ¶ 5]  The parties disagree over whether Defendant made clear that he would also interview youths about the child abuse allegations, but it is undisputed that Defendant arranged with the Children, Youth and Families Department (CYFD) for CYFD personnel to accompany him to the Ranch to interview youths there. [Doc. 91, ¶ 10; Doc. 94, SAMF ¶ 10, 13-14; Doc. 95]  On September 30, 2013, Defendant arrived at the Ranch with five other state police officers as well as five staff members of CYFD. [Doc. 91, ¶ 14-15; Doc. 94, SAMF ¶ 16]  Plaintiffs allege that, over objections by the Chandlers and "[u]sing threats

and coercion, CYFD and the New Mexico State Police entered the property and interviewed the youths without permission or a warrant." [Doc. 76, ¶ 47] Specifically, Plaintiffs allege, on behalf of the Program and Scott, that

> 90. Neither Officer Gonzales nor CYFD had warrants or court orders allowing them to enter the Tierra Blanca Ranch property and interview the youths living there on September 30, 2013.

> 91. There were no exigent circumstances justifying entry onto the Tierra Blanca Ranch property and the lengthy (seven hour) detention of persons present there on September 30, 2013.

> 92. Officer Gonzales wrongfully obtained consent to entry [sic] onto the Tierra Blanca Ranch property by intimidation, to wit, the presence of Officer Gonzales and other members of the New Mexico State Police and their official vehicles.

> 93. Officer Gonzales wrongfully obtained consent to entry [sic] onto the Tierra Blanca Ranch property by deception, to wit, lying about the intended scope of the youth interviews by falsely stating he intended to investigate the car accident.

> 94. As a result of Officer Gonzales' failure to obtain a warrant or lawful consent to search of the premises and detention of the persons therein, Plaintiffs were subject to various actions which have shut down or severely limited the TBR Youth Program causing lost income and future earnings.

> 95. In addition to shutting down the program these actions permanently damaged Scott Chandler's name and reputation. This damage severely limits his future earning capacity in any field of work.

[Doc. 76]

Count II is titled "§ 1983 Unlawful Detention in Violation of the Fourth Amendment." [Doc. 76] Plaintiffs allege, on behalf of Hall, that Defendant "illegally entered onto the Tierra Blanca Creek Ranch property and detained Bryce Hall against his will without warrants or other legal basis," [Doc. 76, ¶ 102] and that "because of the actions by [Defendant,] and/or others under his command or in the course of events

instigated by him, Plaintiff Bryce Hall was forcibly sent away from the Program and deprived of his constitutional right of association, and the care and guidance of the . . . Program, which he was depending on to turn his life around and keep him out of trouble." [Doc. 76, ¶ 110]  Plaintiffs further allege that after the interviews, CYFD "directed [the parents of youths in the Program] to remove their youths from the . . . Program because the Program was going to be shut down."   [Doc. 76, ¶ 60]   The *Second Amended Complaint* states that Scott was forced to "return the boys to their families due to the untenable situation caused by the actions of CYFD following the September 30, 2013, interviews."  [Doc. 76, ¶ 56]

## II. Discussion

### A. Defendant's *Motion for Summary Judgment*

Defendant now moves for summary judgment on the basis of qualified immunity. [Doc. 91]  Plaintiffs oppose the motion and move for additional discovery pursuant to Rule 56(f).  [Doc. 94][2]  Summary judgment is appropriate "if the movant shows that there

---

[2] Defendant first moved for summary judgment on December 14, 2016 [Doc. 51], before the Second Amended Complaint was filed on March 21, 2017.  [Doc. 76]  After briefing was complete, the parties agreed at a telephonic status hearing on September 6, 2017, that the *Motion for Summary Judgment* should be considered in light of the facts alleged in the *Second Amended Complaint* and Defendant's *Answer* to it, and Defendant expressed a need to modify his *Motion* so as to incorporate matters raised in the *Second Amended Complaint*.  Defendant's request was unopposed.  [Doc. 89]  Hence, this Court denied the initial *Motion for Summary Judgment* and gave permission for Defendant to file an amended motion.   [Doc. 89]   This *Memorandum Opinion and Order* addresses Defendant's *Motion for Summary Judgment* subsequently filed on September 22, 2017 [Doc. 91] and related documents.  [Doc. 94 (*Response*), Doc. 95 (*Reply*)]  The Court will consider only the arguments set forth in the September 22, 2017 *Motion* and related documents, and will not consider arguments or statements of fact in the earlier motion. However, to the extent both parties refer to exhibits appended to the December 2016

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this Rule, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Generally, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted). The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) (citation omitted). The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks and citation omitted). Upon a

---

motion and related documents [Doc. 51; Doc. 61; Doc. 71] in addition to exhibits appended to Documents 91, 94, and 95, the Court will refer to those exhibits as well.

motion for summary judgment, "[t]he court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues" and "consider the record in the light most favorable to the party opposing the motion." *United States v. O'Block*, 788 F.2d 1433, 1435 (10th Cir. 1986). If the responding party fails to properly address the movant's assertion of fact as required by Rule 56(c), a district court may "grant summary judgment if the motion and supporting materials— including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

The doctrine of qualified immunity shields government officials performing discretionary functions from suit and liability for civil damages "unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Eaton v. Meneley*, 379 F.3d 949, 954 (10th Cir. 2004). "[W]hen a defendant raises the defense of qualified immunity, the plaintiff has the initial two-part burden to show that (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Sweat v. City of Las Cruces*, No. 15-CV-0226 RB/SMV, 2016 WL 9087264, at *3 (D.N.M. Apr. 21, 2016); *see Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (internal quotation marks and citation omitted). A plaintiff ordinarily demonstrates that a law is clearly established by referencing a Supreme Court or Tenth Circuit decision on

point, or showing that the clearly established weight of authority from other courts has determined the law to be as the plaintiff maintains. *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). Only if the plaintiff satisfies both elements does the defendant bear the normal burden of the summary judgment movant of "showing that no material factual issues remain to defeat his claim of qualified immunity." *Pallottino*, 31 F.3d at 1026 (quoting *Losavio*, 847 F.2d at 646).

Consistent with this framework, the Court will first examine whether Plaintiffs have raised a question of fact as to whether Defendant violated their constitutional rights, then address whether the law was clearly established such that a reasonable officer would have known that his conduct was unlawful under the circumstances.

## 1. Whether Defendant Violated Plaintiffs' Fourth Amendment Right to be Free of Unreasonable Searches and Seizures

Defendant asserts that he is entitled to qualified immunity because Colette and/or Scott consented to his entry to the Ranch, and, therefore, he did not violate Plaintiffs' Fourth Amendment rights. Plaintiffs argue that any consent given by Colette or Scott was coerced by Defendant's trickery or demanding and threatening behavior. Alternatively, they argue that questions of material fact preclude summary judgment as to whether Scott or Colette voluntarily consented to Defendant's entry onto the property. [Doc. 94]

The Fourth Amendment provides:

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no [w]arrants shall issue, but upon probable cause, supported by [o]ath

or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"It is a basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (internal quotation marks and citation omitted). "But . . . this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Id.* (alterations, internal quotation marks, and citation omitted). When the Fourth Amendment is implicated, the Government bears the burden of demonstrating that a warrant was not required because an exception applied. *See United States v. Jeffers*, 342 U.S. 48, 51 (1951) (stating that "the burden is on those seeking the exemption [from the warrant requirement] to show the need for it").

One such exception to the Fourth Amendment's warrant requirement is voluntary consent. When officers obtain voluntary consent to enter a home, a warrantless search or seizure is not unconstitutional. *See United States v. Lopez*, 777 F.2d 543, 548 (10th Cir. 1985). To establish that there was voluntary consent, "(1) there must be clear and positive testimony that consent was unequivoc[al] and specific and freely and intelligently given; [and] (2) the Government must prove consent was given without duress or coercion, express or implied." *Id.* (internal quotation marks and citation omitted). "[T]he courts indulge every reasonable presumption against the waiver of fundamental constitutional rights and there must be convincing evidence that such rights were waived." *Id.* (alterations, internal quotation marks and citation omitted). Consent may be demonstrated by actions, rather than communicated verbally. *See United States*

*v. Payan*, 905 F.2d 1376, 1379 (10th Cir. 1990) (consent given where the officer "asked [the defendant], 'would you mind opening the trunk,' and [the defendant] had done so without hesitancy or comment").

Consent may be rendered involuntary, i.e., coerced, by use of "physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery." *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994). Other factors include the number of officers present and the physical and mental capacity of the defendant. *See United States v. Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012). "[G]overnment actions are coercive when they imply an individual has no right to refuse consent," or that there will be "punitive ramifications" for refusal of consent. *United States v. Harrison*, 639 F.3d 1273, 1279 (10th Cir. 2011) (internal quotation marks and citation omitted). No one factor is dispositive; rather, the Court must assess the totality of the circumstances. *United States v. Gay*, 774 F.2d 368, 376 (10th Cir. 1985) ("Whether a consent was voluntary or was the product of coercion or duress, express or implied, is to be determined by the totality of the circumstances."). Whether a person gave voluntary consent is judged by an objective standard: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. Waupekenay*, 973 F.2d 1533, 1535 (10th Cir. 1992) (internal quotation marks and citation omitted). Thus, a plaintiff's beliefs about the exchange are immaterial to the extent they differ from what a reasonable person would have understood.

"[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the

officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621, 628 (1991). For example, in *United States v. Iribe*, our Tenth Circuit held that there was no coercion where, although there were five officers present, the exchange between the officers and the consenting person was "cordial and spoken in low volume[,] [n]o promises or threats were made in an attempt to extract her consent[, and she] . . . signed a consent to search form[ which] contained a clause discussing the right to refuse consent." 11 F.3d 1553, 1557-58 (10th Cir. 1993). In *Wilson*, the Court held that what began as a consensual encounter evolved into a nonconsensual seizure when the officers made "statements about the legality of Wilson's refusal, and order[ed her] to go get her son or . . . they would do it for her, after persistently asking her to do so." *Wilson v. Jara*, 866 F. Supp. 2d 1270, 1298 (D.N.M. 2011), *aff'd,* 512 F. App'x 841 (10th Cir. 2013).

Finally, "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant." *United States v. Matlock*, 415 U.S. 164, 171 (1974). Instead, the prosecution "may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Id.* "[A] third party has authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." *United States v. Rith*, 164 F.3d 1323, 1329–30 (10th Cir. 1999). The husband-wife relationship gives rise to such a presumption of authority. *Id.* at 1330.

***The Facts Leading to Consent***

The following facts are undisputed except as noted.  On September 24, 2013, Defendant contacted Scott seeking to interview Scott and residents of the Program and to arrange a time for the interviews.  While the parties agree that this call took place, they disagree on whether it was clear from the call that Defendant wished to interview all of the residents and whether Scott agreed that he could do so.  [*See* Doc. 51-1, Gonzales affidavit, ¶ 11; Doc. 94, pg. 46, Scott affidavit, ¶¶ 5, 6, 10]  The transcript of the September 24 call includes the following exchanges:

> **FELIPE GONZALEZ:**  Like I said, I would like to get everybody's side of the story as far as my investigation and their investigation because unfortunately it's [sic] all links together.  They are kids at your ranch still.

> **SCOTT CHANDLER:** I'm trying to understand.  Like the guys involved in the accident, is it regarding the accident? Or [sic] it regarding all this other stuff?

> **FELIPE GONZALEZ:** It's going to regard both, unfortunately.  Hello?  Are you there Mr. Chandler?

> **SCOTT CHANDLER:** Yes.

[Doc. 51-2, Tr. 9/24/13, 23:15-24]

> **FELIPE GONZALEZ:** Okay.  Well unfortunately -- How many kids total do you have in the ranch?

> **SCOTT CHANDLER:** Thirteen.

> **FELIPE GONZALEZ:** Oh, okay.  I thought it was like twenty something.

> **SCOTT CHANDLER:** No.

> **FELIPE GONZALEZ:** Okay.  Thirteen.

[Doc 51-2, Tr. 9/24/13, 32:13-19]  Elsewhere in the transcript, Scott refers to "pulling out those guys," apparently referring to selecting a few of the youth residents for interviews. [Doc. 51-2, Tr. 9/24/13, 35:5-6]  During the conversation, Scott voluntarily suggested that the interviews take place at the ranch.  [Doc. 51-2, Tr. 9/24/13, 35:1-7; Doc. 91, ¶ 12; Doc. 94, ¶ 7]  Defendant and Scott agreed that the interviews would take place on Monday, September 30, 2013, at 10:00 a.m.  [Doc. 51-2, Tr. 9/24/13, 35:9 – 36:16; Doc. 91, ¶ 13; Doc. 94, ¶ 8]  Scott was not informed that Defendant would be accompanied by CYFD personnel.  [Doc. 94, SAMF ¶¶ 13-14; Doc. 95]

On the morning of September 30, 2013, Defendant, five other New Mexico State Police officers, and five representatives of CYFD arrived at the Ranch to conduct interviews.  [Doc. 91, ¶ 14; Doc. 94, ¶ 9, SAMF ¶ 16 (stating number of officers and CYFD personnel); Doc. 95]  They were stopped at the property gate by Colette, who called Scott on a speaker phone.  [Doc. 91, ¶ 15; Doc. 94, ¶ 10, SAMF ¶ 18]  Defendant then spoke with Scott on speaker phone regarding the number of youths who would be interviewed.  [Doc. 51, Exh C (transcript of 9/30/13 call); Doc. 61, Exh. 6 (Colette affidavit, ¶ 5); Doc. 91, ¶ 15; Doc. 94, ¶ 10, SAMF ¶ 23-27; Doc. 95]  During the conversation, Defendant stated to Scott that he wished to interview all of the residents of the Program.  [Doc. 51-3, Tr. 9/30/13, 2:17-3:21; Doc. 91, ¶ 16; Doc. 94, ¶ 11]  The exchange was as follows:

**SPEAKER 2[3]:** Pretty good.  We're out here at the ranch.  I see there's some kind of misunderstanding here on what was supposed to happen today.  It was under my impression that we were both on the same page on interviewing all thirteen children.

**SCOTT:** No.  You told me when you called and you left a voicemail that you needed to interview the boys that were from the wreck.

**SPEAKER 2:** No.

**SCOTT:** Not all the boys were in the wreck.  You said, your words were, "uniforms already interviewed those guys" but you had to follow up.

**SPEAKER 2:** With those kids including [sic], because that's why I had asked you how many kids total do you have at the ranch.

**SCOTT:** You told me you thought we had twenty kids and I told you we had thirteen.  You didn't say you needed to interview all thirteen.

**SPEAKER 2:** I said I have that investigation that was given to me by Mr. Cohen [the child abuse investigation] and I need to investigate those allegations as well.

**SCOTT:** That's why I asked you.  I said, "so you're asking these guys from the wreck stuff about – "I told you, you were going to ask them only stuff about the wreck and you said, no, you'll be asking them stuff about both."

**SPEAKER 2:** Yeah.  That was all thirteen kids.

**SCOTT:** My impression it was boys from the wreck.  That was what I understood and when you called you said you needed to talk to the boys from the wreck.

**SPEAKER 2:** Okay.  Obviously there's a misunderstanding.

**SCOTT:** I wanted those guys so that they just went and did their ordinary day and held back the guys you needed.

[Doc. 51-3, Tr. 9/30/13, 2:17-3:21]

---

[3] Plaintiffs agree for purposes of this *Motion* that "SPEAKER 2" is Defendant "or another officer working under his direction as lead investigator."  [Doc. 94, pg. 30; *see* Doc. 91, ¶¶ 15-19 (stating that the conversation transcribed is between Defendant and Scott)]

During the conversation, Defendant stated that Scott could not be present while the interviews with the youths took place because Scott was "listed as a suspect." [Doc. 51-3, Tr. 9/30/13, 5:20-25; Doc. 91, ¶ 17; Doc. 94, ¶ 12, SAMF ¶ 25] He further stated that no one other than law enforcement or CYFD personnel could be in the room when interviewing victims of child abuse. [Doc. 51-3, Tr. 9/30/13, 6:4-6; Doc. 91, ¶ 17; Doc. 94, ¶ 12; SAMF ¶ 25] Defendant offered to retrieve the youth residents who were working offsite and bring them to the Ranch to start the interviews, but Scott stated that he could send somebody to get them. [Doc. 51-3, Tr. 9/30/13, 7:4-12; Doc. 91, ¶ 18; Doc. 94, 13, SAMF ¶¶ 26-27]

At the end of the conversation the phone was passed back to Colette. [Doc. 91, ¶ 19; Doc. 94, ¶ 14] Defendant states that "[f]ollowing [Colette] concluding her conversation with [Scott], [Defendant] asked, 'So I guess for now, are we able to go in and out?' to which [Colette] responded, 'yeah we can go in and . . . yeah. Let's just get it going.'" [Doc. 91, ¶ 20; Doc 51-4 (Conv. w/ Colette), Tr. 2, 9/30/13, 6:8-16] Plaintiffs dispute that the transcript cited by Defendant supports this assertion and state that "[i]t is impossible to discern from the transcript provided who was speaking to [Colette] . . . and the context of the discussion is not clear from the transcript." [Doc. 94, ¶ 15] Nevertheless, Plaintiffs do not dispute that Colette ultimately gave permission for Defendant and the others to enter the property. [Doc. 94, SAMF ¶ 30] Thus, the precise statement permitting access—and the parties' dispute over it—is immaterial at this juncture.

A few hours after Defendant's arrival and after Defendant and some officers ate lunch provided by Colette, the youths returned to the Ranch and interviews began. [Doc. 91¶ 23; Doc. 94, ¶ 17]  Hall was one of the residents interviewed.  [Doc. 91, ¶ 24; Doc. 94, ¶ 18]  Defendant did not personally interview Hall.  [Doc. 91, ¶ 25; Doc. 94, ¶ 19]

With this background in mind, the Court will examine each count in the *Second Amended Complaint* in turn.

**Count I: The Program's and Scott Chandler's Claims for § 1983 Unlawful Entry and Unreasonable Search and Seizure and Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments.**

### Claims by the Program

As a preliminary matter, the Court notes that, in the *Second Amended Complaint*, Plaintiffs assert a Fourth Amendment claim on behalf of the Program.  [Doc. 76]  It is undisputed that the Program is a sole proprietorship owned by Scott.  [Doc. 76, ¶ 9; Doc. 91, ¶ 1; Doc. 94, ¶ 1]  Defendant argues that the Program's claim must be dismissed because, as a sole proprietorship, the Program has no legal identity separate from Scott. [Doc. 91, pg. 7]  *See Two Old Hippies, LLC v. Catch the Bus, LLC*, 784 F. Supp. 2d 1221, 1225 (D.N.M. 2011) (stating that a sole proprietorship "has no legal identity separate from the proprietor himself"); 1 William M. Fletcher, et al., Cyc. of the Law of Corp. § 23 (stating that "[a] sole proprietorship is merely a designation assigned to a manner of doing business by an individual who is solely responsible for all of the debts and obligations of the business; no legal distinction exists between the individual and the business.").  Plaintiffs do not respond to this argument.  [Doc. 94]  The Court agrees with

Defendant that, because it is indistinct from its owner, a sole proprietorship "does not have standing to sue in its own right." *Geneva Coll. v. Sebelius*, 929 F. Supp. 2d 402, 429 (W.D. Pa. 2013), *on reconsideration in part* (May 8, 2013); *Crane Const. Co. v. Klaus Masonry*, 71 F. Supp. 2d 1138, 1144 (D. Kan. 1999) (stating that "a sole proprietorship is unable to bring suit in its own name"). Hence, to the extent the Program asserts any claims, they must be dismissed.

### *Whether the Fourth Amendment Applies*

Defendant next argues that the Fourth Amendment's protections do not apply here because "neither a search or seizure of the property nor a search or seizure of Mr. Chandler's person was conducted on September 30, 201[3]." [Doc. 91, pg. 10] However, in *Payton*, the Supreme Court held that "'the Fourth Amendment has drawn a firm line at the entrance to the house.'"[4] *United States v. Reeves*, 524 F.3d 1161, 1165 (10th Cir. 2008) (quoting *Payton v. New York*, 445 U.S. 573, 590 (1980)); *United States v. Lindgren*, No. CRIM.A. 11-10019-03, 2013 WL 147369, at *6 (D. Kan. Jan. 14, 2013) ("The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (internal quotation marks and citation omitted)). Moreover, "[t]he Supreme Court has rejected the proposition that the Fourth Amendment offers no

---

[4] Neither party indicates whether the Chandlers lived at the Ranch. In Plaintiffs' *Second Amended Complaint*, they state the Ranch was the Chandlers' "business premises" and that Hall "resided" there. [Doc. 76, ¶¶ 1, 41] Hence, it appears that only Hall lived at the Ranch. In any case, "[t]he Warrant Clause of the Fourth Amendment protects commercial buildings as well as private homes. . . . Th[e Supreme] Court has already held that warrantless searches are generally unreasonable, and that this rule applies to commercial premises as well as homes." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311–12 (1978).

protection against government entry into a home unless the entry is to conduct a 'search' for or 'seizure' of the fruits or instrumentalities of crime." *Walsh v. Erie Cty. Dep't of Job & Family Servs.*, 240 F. Supp. 2d 731, 744 (N.D. Ohio 2003) (citing *Camara v. Municipal Court,* 387 U.S. 523, 526 (1967)). Consistent with this principle, our Tenth Circuit has stated that, "[o]f course, a police officer's mere entry or trespass into a home without consent is enough to constitute a search, often referred to in the case law as an 'unlawful entry,'" *Reeves v. Churchich*, 484 F.3d 1244, 1258 (10th Cir. 2007), and that "if an individual's decision to open the door to his home to the police is not made voluntarily, the individual is seized inside his home." *Reeves*, 524 F.3d at 1168. Hence, Defendant's argument that the Fourth Amendment simply does not apply here is unavailing. *See Lopkoff v. Slater*, 898 F. Supp. 767, 773 (D. Colo. 1995) (stating that the "[d]efendants have cited no authority, and this Court has found none, that supports [the d]efendants' argument that entry into an apartment without a warrant is justified if it does not result in a person being arrested or taken into custody").

### *Whether Colette or Scott Consented to Entry*

The next question is whether Plaintiffs have shown a question of fact surrounding whether Colette or Scott voluntarily consented to Defendant's entry to the Ranch. If, as Defendant argues, the undisputed facts show that Colette and Scott voluntarily consented to Defendant's entry, then there was no constitutional violation and the Court's inquiry is complete. In that case, Defendant would be entitled to qualified immunity. If, on the other hand, Plaintiffs demonstrate that there is a factual question precluding summary judgment as to whether Colette's and Scott's consent was coerced, then the Court must

go on to determine whether the constitutional right allegedly violated was clear such that Defendant would have known his conduct was illegal.

The parties devote substantial portions of their arguments to whether Defendant misrepresented his intent to Scott in the days leading up to September 30, 2013, and to what Scott knew about Defendant's investigation and when he knew it. The parties argue over what was said during the September 24, 2013 call, whether there was a second call on September 27 or 28, 2013, what was said during the second call, and what Scott knew about the scope of the interviews before September 30, 2013. [Doc. 91, pg. 11; Doc. 94, pg. 26-29] Both parties' reliance on these calls, however, is misplaced.

To the extent Defendant relies on Scott's consent during the September 24, 2013 phone call to Defendant's entry to the Ranch, such consent, if any, is relevant only to the extent it informs the Court's analysis of Colette and Scott's consent on September 30, 2013 at the gate to the Ranch. This is so because it is clearly established that consent may be withdrawn. *See United States v. Torres*, 663 F.2d 1019, 1027 (10th Cir. 1981) (stating that "[t]he question as to whether [consent] was [withdrawn] is . . . a factual one"). Thus, even if Scott had agreed to the interviews during calls on September 24th or 28th, viewing the facts in the light most favorable to Plaintiffs, it is clear that Colette stopped Defendant and the other officers and CYFD personnel at the gate to the Ranch because the circumstances surrounding their entry differed from her expectation based on the calls. [Doc. 91, ¶ 15 (Defendant stating that he was "not permitted entrance onto the property" when he arrived at the Ranch); Doc. 94, ¶ 10, SAMF ¶ 18; Doc. 19] Similarly, Scott expressed several times during the speaker phone call on September 30, 2013, that

he had not given consent for Defendant to interview all of the youths at the Ranch about both the accident and the child abuse allegations. [Doc. 94, SAMF ¶ 27; Doc. 95; Doc. 51-3, Tr. 9/30/13] Hence, viewing these facts and their implications in Plaintiffs' favor, any consent given during the phone calls was withdrawn at the gate. *See Manzanares v. Higdon*, 575 F.3d 1135, 1143 (10th Cir. 2009) (recognizing that "consent which waives Fourth Amendment rights may be limited, qualified, or withdrawn" (internal quotation marks and citation omitted)); 4 Wayne R. LaFave, Search & Seizure § 8.2(f) (5th ed.) ("A consent to search is not irrevocable, and thus if a person effectively revokes his prior consent prior to the time the search is completed, then the police may not thereafter search in reliance upon the earlier consent.")

For their part, Plaintiffs rely on the September 24, 2013 call to argue that Defendant used "trickery" to obtain Scott's consent to access the property, and cite *Harrison*, in which the Tenth Circuit stated that "the Fourth Amendment can certainly be violated by guileful as well as by forcible intrusions into a constitutionally protected area." 639 F.3d at 1278–79 (internal quotation marks and citation omitted). Noting that it has "repeatedly held that deception and trickery are among the factors that can render consent involuntary," the Court went on to state that whether the Government "misrepresent[ed] the nature of th[e] investigation" is considered as part of the totality of the circumstances surrounding consent to search. *Id*.

Plaintiffs' reliance on *Harrison* is misplaced because at the time Scott and Colette agreed to allow Defendant onto the Ranch property, any misrepresentation or obfuscation about the nature of the investigation had been eliminated. Plaintiffs do not dispute that

Defendant told Scott, while the phone was on speaker, that 1) he wished to interview all of the youth residents, 2) the investigation was about both the accident and the child abuse allegations, and 3) Scott was a suspect. [Doc. 61, pg. 10, ¶ 19; Pg. 11, ¶¶ 20, 24; Doc. 51-3, Tr. 9/30/13, 5:20-25; 2:17-3:21] Hence, assuming that Defendant concealed or misrepresented these facts prior to September 30, 2013, they were revealed during that phone call. Colette and Scott were therefore fully informed as to the nature of the investigation by the end of the call. The Court concludes that the telephone calls leading up to Defendant's arrival at the Ranch gate are relevant only to the extent they had an impact on the voluntariness of either Colette's and/or Scott's consent on September 30, 2013.

Plaintiffs argue that Colette's and Scott's consent was coerced because of the number and type of officers present and because Defendant "demanded" access to the property and threatened to take custody of all of the youth residents. [Doc. 94, pg. 57, Colette affidavit, ¶¶ 9, 12, 14; Doc. 94, pg. 46, Scott affidavit, ¶¶ 25-27; Doc. 94, pg. 46, Scott affidavit, ¶¶ 18, 19, 25, 26] After review of the record, the Court finds that questions of fact preclude summary judgment on this issue. First, it is undisputed that Defendant was accompanied by five other officers and five CYFD personnel, whereas Colette and Scott were expecting only Defendant and "a couple of" officers. [Doc. 94, pg. 57, Colette affidavit, ¶¶ 3, 5; Doc. 91, ¶ 14; Doc. 94, ¶ 9, SAMF ¶¶ 13, 14; Doc. 95] It is also undisputed that Defendant did not tell Scott that CYFD personnel would be present to interview the youths. [Id.]

Second, Plaintiffs submitted affidavits by Scott and Colette stating that Defendant "demanded" entry to the Ranch and that, because of Defendant's conduct, they did not feel free to refuse consent. [Doc. 94, pg. 46, Scott affidavit; Doc. 94, pg. 57, Colette affidavit] Both Scott and Colette state that Defendant threatened to take the youths away from the Ranch if they did not consent. [Doc 94, pg. 57, Colette affidavit, ¶¶ 9, 12, 14; Doc. 94, pg. 46, Scott affidavit, ¶¶ 18, 19, 25, 26; *see* Doc. 94, SAMF ¶¶ 28, 30] Defendant does not dispute the latter assertion in his *Reply* as required by Local Rule 56.1(b), which provides that "[t]he Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection" and that "[e]ach fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact." Instead, he states that Plaintiffs' additional facts "do not controvert Defendant's material facts which Defendant relies upon for summary judgment" and that "Plaintiffs' facts are therefore immaterial." [Doc. 95, pg. 1] "An assertion of relevancy, without more, does not specifically dispute an enumerated undisputed fact but rather constitutes argument of counsel." *Martinez v. Romero*, No. CIV-11-785 ACT/WDS, 2012 WL 13071884, at *3 (D.N.M. Nov. 19, 2012).

Instead, Defendant argues elsewhere in his *Reply* that Plaintiffs' assertions that he threatened to remove the youths are contradicted by the record and points to the transcript of his conversation with Scott on the speaker phone. [Doc. 95, pg. 10-11; Doc. 51-3] He argues that "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

adopt that version of the facts." [Doc. 95, pg. 3 (quoting *Thomson v. Salt Lake City*, 584 F.3d 1304, 1312 (10th Cir. 2009) (alterations omitted)].

Defendant's argument is unavailing for several reasons. First, it is unclear from the transcripts whether they encompass the entirety of conversations at the gate. For instance, none of the transcripts includes a greeting between Defendant and Colette, suggesting that there is a portion of their interaction not captured. Similarly, there is no evidence of how much time, if any, elapsed between the conversation with Scott on the telephone and the subsequent conversation with Colette, and what, if anything, was said during that time. [*See* Doc. 51-3, 51-4] Moreover, a third transcript provided by Plaintiffs is unclear as to the identity of the speakers and the time the conversation occurred. [Doc. 61, pg. 59 (denoting the speakers as "Felipe Gonzales," "Mrs. Chandler," and "Male2," but also indicating that it is unclear whether one of the males speaking is Defendant)] Hence, the Court cannot find, based on this record, that the transcripts are complete representations of the exchanges at the gate. *Cf. Seidel v. Crayton*, No. CV 15-00925-MV/CG, 2017 WL 4737254, at *7 (D.N.M. Oct. 19, 2017) (stating that a plaintiff's assertions are not "blatantly contradicted by the record" where "the video d[id] not clearly show whether [the officer] applied any force to [the plaintiff because t]he placement of the camera and the location of the [p]laintiffs' SUV obscure[d] the positions of [the officer's] hands and arms and [the plaintiff's] body").

Second, Defendant implies that an affidavit submitted by a nonmovant does not constitute evidence in the record. But "[a]s long as an affidavit is based upon personal knowledge and sets forth facts that would be admissible in evidence, such averment of a

party is legally competent to oppose summary judgment, notwithstanding its inherently self-serving nature." *Williams v. Shields*, 77 F. App'x 501, 503 (10th Cir. 2003) (alteration, internal quotation marks, and citation omitted); *see Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (stating that affidavits may create a question of fact and that "affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient"); Fed. R. Civ. P. 56(c)(1) (stating that a nonmovant may support its assertions of fact by referring to "*materials in the record*, including depositions, documents, electronically stored information, *affidavits or declarations*, . . . ." (emphasis added). In *Williams*, for example, an affidavit by the defendant stating that he was released from prison on July 11, 2000, was valid to establish a question of material fact even though it was contradicted by other evidence in the record, such as prison records, showing that he was released on July 10, 2000. 77 F. App'x at 503; *see Hall v. Queensbury Union Free Sch. Dist.*, 147 A.D.3d 1249, 1252 (N.Y. App. Div. 2017) ("While the affidavit . . . was contradicted by other evidence in the record, such contradictions presented credibility determinations, which [the] Supreme Court should have left to be resolved by the trier of fact").

Finally, cold transcripts do nothing to resolve the conflict in the parties' characterization of Defendant's conduct and the encounter as a whole, as it is impossible to determine the tone and tenor of the conversation from the text. *See United States v. Williams*, No. 2:09-CR-27-FTM-29DNF, 2010 WL144870, at *5 (M.D. Fla. Jan. 8, 2010) ("The disadvantage of reviewing a 'cold' transcript is that a court is unable to discern the

nuances of language, tone, inflection and demeanor."); *cf. Benavidez v. Shutiva*, 2015-NMCA-065, ¶ 27, 350 P.3d 1234 (concluding that "interpretation of [a] video gives rise to a dispute over material facts" where the officers' and defendant's conduct depicted in the video could be interpreted several ways).

The Court concludes that Plaintiffs have demonstrated that a material question of fact exists as to whether Defendant's statements, conduct, or demeanor, under the totality of the circumstances including the number and type of officers and interviewers present and the alleged threat to remove youths from the Ranch, unlawfully coerced Colette's or Scott's consent for his entry onto the Ranch property. *Cf. Walsh*, 240 F. Supp. 2d at 748 (holding that "a reasonable jury could find that any putative consent given by Mr. Walsh was coerced by *references to removal of the children if opposition continued*; detention of the family; frisk of the father; *the number, office, and power of the county officials and city officers present*; and the apparent (or, at least threatened) arrest of Mr. Walsh for obstruction of official business" (emphasis added)); *Adelman v. Smith*, No. 2:13-CV-0096-ABJ, 2015 WL 11090921, at *9 (D. Wyo. Aug. 10, 2015) ("Because of the disparity in the [d]efendants' and [p]laintiffs' depiction of events, which the audio tape does not resolve, the [c]ourt finds that there are disputed facts, specifically whether [the plaintiff] gave her consent for [the d]efendant to enter [her] home, which a reasonable juror could resolve in favor of either side on the issue of whether [the d]efendants violated [the p]laintiffs' Fourth Amendment right to be free from unreasonable

searches.") *reconsideration denied,* No. 2:13-CV-0096-ABJ, 2015 WL 11108640 (D. Wyo. Oct. 30, 2015).[5]

### Count II: Hall's Claim for § 1983 Unlawful Detention in Violation of the Fourth Amendment

Defendant argues that 1) he is not the appropriate defendant for Plaintiff Hall's Fourth Amendment claim because he did not personally interview Hall, and that 2) "the undisputed facts in this case demonstrate that the interview of Plaintiff Hall was a

---

[5] The parties devote much of their briefing to the issue of Scott's consent. They do not address the significance, if any, of the undisputed fact that Scott was not present at the gate. "[Supreme Court] cases firmly establish that police officers may search jointly occupied premises if one of the occupants consents." *Fernandez v. California*, 134 S. Ct. 1126, 1129 (2014) (footnote omitted); *see United States v. Garcia*, 861 F. Supp. 996, 1004 (D. Kan. 1994) (discussing *Matlock*, 415 U.S. 164, and stating that in *Matlock* "the joint occupant had her own right to consent to a search of the premises and that the defendant had assumed the risk that she might exercise that right while he was away from the residence."). However, "'a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant.'" *United States v. Cos*, 498 F.3d 1115, 1131 (10th Cir. 2007) (quoting *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006)). In *Randolph*, a husband objected to a search of his home, but his wife agreed to allow the search over his objection. *Randolph*, 547 U.S. at 107. The Supreme Court held that the physically present husband's express objection should be given effect over the wife's consent. *Id*. at 122-23. However, "[t]he Court's opinion [in *Randolph*] went to great lengths to make clear that its holding was limited to situations in which the objecting occupant is present." *Fernandez*, 134 S. Ct. at 1133; *id*. at 1129 (stating that *Randolph* stated "a narrow exception" to the general rule that a single occupant may give consent). The corollary to the *Randolph* rule is that "a co-tenant's consent to search a shared residence may be valid as against an *absent*, nonconsenting tenant." *United States v. McKerrell*, 491 F.3d 1221, 1227 (10th Cir. 2007) (Emphasis added); *see Webb v. Brawn*, 625 F. App'x 191, 193 (4th Cir. 2015) (stating that "[the co-tenant's] consent to search the home prevailed over [the defendant's] objections to the search, in light of the fact that she was present at the house and [the defendant] elected to be absent despite requests from law enforcement [via telephone] that he come to the house"). Because the Court finds that there is a dispute of material fact as to whether either Colette's or Scott's consent was coerced, it need not address this issue at this time.

consensual encounter with a police officer." [Doc. 9, pg. 16] As to the first argument, the Court disagrees that the fact that Defendant did not personally interview Hall is dispositive. "Government actors may be liable for the constitutional violations that another committed, if the actors set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights, thus establishing the requisite causal connection between the government actor's conduct and a plaintiff's constitutional deprivations." *Trask v. Franco,* 446 F.3d 1036, 1046 (10th Cir. 2006) (internal quotation marks and citation omitted). It is undisputed that Defendant was the lead investigator in charge of the interviews of the youths, arranged to have CYFD personnel present to interview youths, and prepared the questions to be asked of the youths. [Doc. 94, ¶¶ 34, 35; Doc. 95] Hence, this argument is unavailing.[6]

---

[6] Defendant also states that "Plaintiffs appear to attempt to circumvent the Court's ruling regarding their inability to establish that 'Defendant's conduct was a substantial factor' leading to the removal of Mr. Hall and subsequent alleged injuries." [Doc. 91, pg. 17] He goes on to quote from this Court's ruling dismissing Plaintiff Hall's First Amendment association claim, and relies on this Court's ruling to argue that because Defendant did not interview Hall, Defendant cannot be responsible for any allegedly illegal detention. [Doc. 91, pg. 18] In the cited portion, this Court found that Plaintiff Hall had failed to allege facts demonstrating that it was Defendant's conduct which led to Plaintiff Hall's removal from the Program and thus to the injuries that allegedly flowed from removal. [Doc. 75] However, the portion of the *Memorandum Opinion and Order* referenced by Defendant relates only to Plaintiff Hall's injuries related to *removal from the Program.* Indeed, as to Hall's Fourth Amendment claim, the Court also stated that "an unreasonable seizure is itself the injury; a plaintiff is not required to allege any additional "serious injury" or an injury that "shocks the conscience" and that "given the facts asserted [in the *First Amended Complaint*], Plaintiff Hall has alleged sufficient facts to state a claim that his detention itself constituted an injury that was traceable to Defendant's conduct." [Doc. 75] Hence, contrary to Defendant's argument, the Court found explicitly that

As to Defendant's second argument that the interview of Plaintiff Hall was consensual, this contention is based in large part on Defendant's position that Scott and/or Colette consented to his entry onto the Ranch property and to the interview of Hall, a minor under Scott's guardianship. [Doc. 91, pg. 16; Doc. 76, ¶ 17 (alleging that Scott has legal guardianship of youths in the Program)] Defendant also asserts, and Plaintiffs do not specifically dispute, that Hall "never once asked to leave, never requested counsel, and never made any statements indicating he did not want to participate in the interview." [Doc. 95, pg. 13; Doc. 91, ¶ 27; Doc. 94, ¶ 20] However, these facts, even if undisputed, are insufficient on their own to establish Hall's voluntary consent because they do not exist in a vacuum. In other words, Defendant's argument ignores the totality of the circumstances, including the question of fact over whether Defendant and the other officers and CYFD personnel were lawfully on the property at all; Hall's age; and the undisputed facts that: Hall was not told he did not have to consent, that two people interviewed Hall in a closed room, and that no adult from the Program was present during the interview. [Doc. 94, ¶¶ 33-34; Doc. 95 (not specifically disputing these facts); Doc. 94, pg. 71-72, Hall affidavit]

The Court concludes that there is a question of fact as to whether Defendant obtained consent to enter the Ranch and interview Hall through coercive means.

---

Plaintiffs had alleged an unlawful detention that is itself an injury traceable to Defendant's conduct.

**2. Whether the Law was Clearly Established**

Having concluded that Plaintiffs have shown that there is a question of material fact as to whether Defendant violated Plaintiffs' constitutional rights, the Court turns to whether it would have been clear to a reasonable officer that such conduct would violate the Fourth Amendment in the circumstances presented here. The Tenth Circuit recently set out the test for this prong as follows.

> [T]he Supreme Court has repeatedly and consistently warned us not to define clearly established law at [a] high level of generality. Instead, the dispositive question is whether the violative nature of the defendants' *particular conduct* is clearly established. In other words, the clearly established law must be 'particularized' to the facts of the case. Thus, before we may declare the law to be clearly established, we generally require (1) a Supreme Court or Tenth Circuit decision on point, or (2) a showing that the clearly established weight of authority from other courts has found the law to be as the plaintiff maintains.

*Sause v. Bauer*, No. 16-3231, 2017 WL 2641070, at *3 (10th Cir. June 20, 2017) (alterations, internal quotation marks, and citations omitted). A case "on point" does not have to present the same exact facts, but must be analogous enough to show illegality. Hence, "[a]lthough [the plaintiff] need not show that the very action in question has previously been held unlawful, in the light of pre-existing law the unlawfulness must be apparent." *A.M. v. Holmes*, 830 F.3d 1123, 1136 (10th Cir. 2016), *cert. denied sub nom. A.M. ex rel. F.M. v. Acosta*, No. 16-984, 2017 WL 2039255 (U.S. May 15, 2017) (alterations, internal quotation marks, and citation omitted).

Defendant argues that "Plaintiffs have presented no evidence as to why a reasonable officer would not have believed that [Colette's] statements were explicit voluntary consent to enter on to the property." [Doc. 95, pg. 13] He goes on, "There is

simply no clearly established law that would have put a reasonable officer on notice that in conducting voluntary onsite interviews with the children of the ranch, after having obtained consent to enter the property, they could be . . . found to have unreasonabl[y] searched or seized either the ranch itself or [Scott]." [Doc. 95, pg. 13] Finally, as to Plaintiff Hall, he argues that "there is no clearly established law that would have le[]d a reasonable officer to determine that a witness[']s lengthy, forthright, and apparently voluntary interview violated the witness's constitutional right." [Doc. 95, pg. 14]

Defendant's arguments are faulty because he misstates the premise of the inquiry by assuming that Plaintiffs' consent was voluntary. But Plaintiffs have demonstrated a question of fact over whether any consent Scott or Colette gave was coerced by Defendant's threats or intimidating conduct. Thus, the proper inquiry is whether the law was clear that consent obtained through intimidation or threats was unlawful. *A.M.*, 830 F.3d at 1136.

The essential principles of Fourth Amendment law are well established. As another court stated, "[b]asic and applicable Fourth Amendment principles were clearly articulated and firmly embedded in our constitutional jurisprudence well before the events giving rise to this suit." *Walsh*, 240 F. Supp. 2d at 758–59. It is a "bedrock principle" that "government officers cannot enter a home without either prior court approval, consent, or exigent circumstances" *Id.* "[T]he law properly presumes [this principle is] known to every agent of the state who seeks to enter a private home . . . ." *Id.*

In addition, the law related to voluntary consent was clear at the time. In 1973, the United States Supreme Court stated in *Schneckloth v. Bustamonte* that "the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." 412 U.S. 218, 228 (1973). Our Tenth Circuit case law is clear that coercion can occur in a variety of ways, including intimidation, physical force, threats, or misrepresentation. *See McCurdy*, 40 F.3d at 1119. In addition, a number of cases have found that threats involving children can be coercive. *See, e.g.*, *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (holding that the police statements were coercive where the defendant confessed "after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate.'"); *Siliven v. Indiana Dep't of Child Servs.*, 635 F.3d 921, 926 (7th Cir. 2011) (stating that "[i]n the context of Fourth Amendment seizures involving official coercion, we have noted that a threat becomes more coercive as the cost of non-compliance increases relative to the cost of compliance" and that "it is difficult to overstate the cost of non-compliance—losing custody of one's child, even temporarily" where officers had threatened to place the child in foster care if the mother did not take him to his grandmother's house (internal quotation marks and citation omitted)); *United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981) (stating that the officer's statements were "patently coercive" where he told the defendant that, unless she cooperated, "a lengthy prison term could be imposed, that [she] had a lot at stake, that her

cooperation would be communicated to the prosecutor, that her failure to cooperate would be similarly communicated, and that she might not see her two-year-old child for a while" (footnotes omitted)); *Walsh*, 240 F. Supp. 2d at 760 (denying qualified immunity where the officers threatened to arrest the defendant and remove his children if he did not consent, stating that the officers "cannot reasonably claim that they, as reasonable law enforcement officers, would not reasonably have known basic Fourth Amendment doctrines relating to arrests, detentions, and searches" or that they could "believe that consent to enter private premises could be procured by threats and other coercive action").

Defendant appears to rely on the particular context of a child abuse investigation to argue that a reasonable officer would have believed the interview of Plaintiff Hall was lawful. He states that, even if "the interview [of Hall] could be viewed as an investigative detention," Defendant's conduct would be reasonable. [Doc. 91, pg. 17] He argues that his conduct was justified by the fact that "[o]fficers had reasonable suspicion[7] that child abuse was occurring at the youth facility" and that "investigations of the youth facility had already taken place by the time Plaintiff Hall was interviewed." [Doc. 91, pg. 17] This argument is unavailing because the concept of an "investigative

---

[7] To the extent Defendant uses the phrase "reasonable suspicion" to invoke NMSA 1978, § 32A-4-3, which states that "[e]very person . . . who . . . has a reasonable suspicion that a child is an abused or a neglected child shall report the matter immediately" and that "[t]he recipient of a report [of child abuse] shall take immediate steps to ensure prompt investigation of the report," the Court notes that "[a] statutory command to investigate allegations . . . is not a license to ignore the Fourth Amendment, and it is unreasonable for the defendants to think otherwise." *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 421 (5th Cir. 2008).

detention" does not apply in this context. Although he describes it as a "facility," Defendant does not dispute that Hall lived at the Ranch. [*See, e.g.*, Doc. 91, ¶¶ 9, 16, 18, 22, 23, 24 (referring to Hall and the other youths as "residents" of the Ranch); *see* Doc. 91, pg. 16 (stating that Hall was "housed" at the Ranch)] The facts that the Ranch was Hall's home and that Hall was under the legal guardianship of the Ranch owner, Scott, are significant to the Court in applying the correct standard. "[L]abeling an encounter in the home as . . . an investigatory [detention] . . . is meaningless because *Payton*'s requirements apply to all [such] seizures." *Manzanares*, 575 F.3d at 1144 (internal quotation marks and citation omitted) (stating that the defendant's "attempt to label the encounter [in the plaintiff's home] an 'investigative detention' [wa]s of no consequence"). Consistent with *Payton*, even where "there is probable cause to believe that incriminating evidence will be found within a home, police may not enter without a warrant absent exigent circumstances." *Id.* at 1142; *see Payton*, 445 U.S. at 590. Thus, even if the Court construed Defendant's statements as an assertion that there was probable cause, they are still legally insufficient to justify the entry to the Ranch or detention of Hall in his home in the absence of a warrant, exigent circumstances, or consent. Moreover, it was clearly established well before September 30, 2013 that these principles applied to both law enforcement and social workers. The Tenth Circuit has held that "[i]t was clearly established, at least two years before . . . [2005], that absent probable cause *and* a warrant or exigent circumstances, neither police nor social workers may enter a person's home without a valid consent, even for the purpose of taking a child into custody, much less to conduct a search." *Turner v. Houseman*, 268 F. App'x 785,

788 (10th Cir. 2008) (unpublished) (discussing requirements for seizure of a person suspected of abusing his child) (emphasis added); *see Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1250 n.23 (10th Cir. 2003) (stating that, as of 2003, "the law is now clearly established that, absent probable cause and a warrant or exigent circumstances, social workers may not enter an individual's home for the purpose of taking a child into protective custody"); *Franz v. Lytle*, 997 F.2d 784, 793 (10th Cir. 1993) ("eschew[ing] defendant's suggestion. . . [that], in the investigation of claims of child abuse and neglect, police officers are absolved of a warrant or probable cause requirement"). The Court concludes that Plaintiffs have shown that the law governing legal entry to the Ranch and seizure of Hall was clearly established at the time.

In sum, viewing the facts in their favor, Plaintiffs have met their burden to raise a question of material fact over whether Defendant violated their clearly established constitutional right to be free of unreasonable seizures. Hence, Defendant's *Motion for Summary Judgment* will be denied as to qualified immunity against Plaintiffs' Fourth Amendment claims.

**3. Plaintiff Chandler's Malicious Prosecution Claim**

Count I of the *Second Amended Complaint* is titled "§ 1983 Unlawful Entry and Unreasonable Search and Seizure and Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments." [Doc. 76] Defendant argues that "summary judgment is appropriate on Plaintiffs' claim for malicious prosecution" because no search or arrest warrant was issued. [Doc. 91, pg. 13-14] Plaintiffs do not address this argument in their *Response*. [Doc. 94] Although they purport to deny Defendant's statement of fact that

"Scott Chandler has not been prosecuted as a result of the September 30, 2013, interviews," [Doc. 91, ¶ 33] they do not point to evidence that a search or arrest warrant was issued. [Doc. 94, ¶ 26] *See* Local Rule Civ. D.N.M. 56.1(b) ("Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the [Motion] will be deemed undisputed unless specifically controverted.").

The Court notes first that the United States Supreme Court has held that "[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against . . . physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Graham v. Connor,* 490 U.S. 386, 395 (1989); *see Albright v. Oliver,* 510 U.S. 266, 273 (1994) (plurality opinion) (stating that the right to be free of arrest and prosecution without probable cause is governed by the Fourth Amendment, not the constitutional protections for substantive due process). The Tenth Circuit has also "applied this holding when the alleged denial of due process is procedural rather than substantive." *Shimomura v. Carlson*, 811 F.3d 349, 361 (10th Cir. 2015). Hence, the Court will consider Plaintiffs' claim only under the Fourth Amendment. *See Coleman v. Cty. of Lincoln*, No. CV 17-663 GBW/SMV, 2018 WL 401185, at *10 (D.N.M. Jan. 12, 2018) (stating that, where the plaintiffs alleged an unreasonable search and seizure of their home, "[the p]laintiffs' Fourteenth Amendment claim is improper in the context of a

law enforcement search or seizure," and that "the Court [would] only address[ the p]laintiffs' claims under the Fourth Amendment.").

A Fourth Amendment malicious prosecution claim, unlike a false imprisonment claim, arises after the institution of legal process. *See Myers v. Koopman*, 738 F.3d 1190, 1194 (10th Cir. 2013) (footnote omitted), *as amended on denial of reh'g* (Jan. 8, 2014). Claims of malicious prosecution and false imprisonment are akin to "rain and snow[:] the claims emanate from the same source, but under different conditions." *Id*. "What separates the two claims?—the institution of legal process. Unreasonable seizures imposed without legal process precipitate Fourth Amendment false imprisonment claims . . . [whereas] seizures imposed with legal process precipitate Fourth Amendment malicious-prosecution claims." *Id*. "At common law, the issuance of an arrest warrant represents a classic example of the institution of legal process." *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008).

Here, the undisputed facts indicate that an essential element of a malicious prosecution claim—institution of legal process—is missing. Thus, summary judgment as to Plaintiffs' Fourth Amendment malicious prosecution claim shall be granted.

**B. Plaintiffs'** *Rule 56(f) Request for Additional Discovery* **[Doc. 94] and Plaintiffs'** *Motion for Sur-Reply to Defendant's Motion for Summary Judgment* **[Doc. 97]**

In their *Response* [Doc. 94], Plaintiffs state that additional discovery is necessary to permit them to respond adequately to Defendant's *Motion for Summary Judgment*. Specifically, they argue that they need additional discovery addressing what Defendant told Scott about the interviews in the days leading up to September 30, 2013, whether and

when Defendant had a plan for the interviews that he concealed from Scott and Colette, and Defendant's and the other officers' conduct at the gate to the Ranch on September 30, 2013. [Doc. 94, pg. 6-7] Defendant opposes additional discovery, arguing that "[t]he requested discovery is not limited in nature, nor tailored for the purposes of responding to the subject Motion, and are overall irrelevant and unnecessary." [Doc. 95, pg. 14] He also states that Plaintiffs' request is a "red herring" because Plaintiffs are "likely already in possession of the documents they now allege[] they warrant more time to collect" because Plaintiffs have obtained "voluminous documents from CYFD and [Department of Public Safety (DPS)] by and through the current CYFD administrative proceedings [in the First Judicial District Court] and [the Inspection of Public Records Act] requests." [Doc. 95, pg. 15]

Plaintiffs also move for leave to file a sur-reply. [Doc. 97] The purpose of the proposed sur-reply is solely to address Defendant's statements regarding discovery. Plaintiffs argue that Defendant inaccurately presented an essential fact, which is that the discovery obtained in the CYFD proceeding is sealed by order of the First Judicial District Court. [Doc. 97, pg. 2] They note that they have filed a motion to unseal depositions of DPS personnel, and that "[i]n the event the [First Judicial] District Court timely releases the information . . . Plaintiffs will not need additional discovery." [Doc. 97, pg. 3]

Given the Court's conclusion that Plaintiffs have demonstrated a question of fact precluding summary judgment on the basis of evidence already in hand, additional discovery is unnecessary at this time. Hence, Plaintiffs' *Rule 56(d) Request for Time to*

*Conduct Discovery*, and the *Motion for Sur-Reply to Defendant's Motion for Summary Judgment* [Doc. 97] shall be denied as moot.

**C. Plaintiffs'** ***Motion for Spoliation Sanctions against Defendant*** **[Doc. 101]**

Plaintiffs also move for spoliation sanctions against Defendant in the form of a "presumption that the missing audio recordings would have supported the Plaintiffs' argument that the events of September 30, 2013 were not consensual." [Doc. 101] In the *Motion*, Plaintiffs make arguments related to two sets of audio recordings. First, they contend that Defendant was on notice that audio recordings of certain interviews and conversations should have been preserved for litigation but were not. [Doc. 101, pg. 4-5] These included 1) a telephone conversation on September 28, 2013; 2) interviews by Defendant of parents of youths in the Program; 3) an interview by Defendant of Scott Chandler on October 16, 2013; 4) Defendant's conversations with Barbara Holler and Jim Hurt. [Doc. 101, pg. 4-5] Second, they argue that audio recordings by officers present at the Ranch gate on September 30, 2013 should have been preserved but were not. [Doc. 101, pg. 4] Plaintiffs note, however, that "[n]o recording of the conversation between Mrs. Chandler and Officer Williams has been provided and it apparently does not exist" and that Officer Williams stated in deposition testimony that "he did not know why the conversation was not recorded." [Doc. 101, pg. 4] Defendant responded on May 24, 2018. [Doc. 103]

The Court finds that it is unnecessary to address Plaintiffs' *Motion* at this time. Because Plaintiffs' seek only an inference in their favor as to the *Motion for Summary Judgment* and the Court has addressed the *Motion* without reliance on such inference, the

Court will deny the *Motion for Spoliation Sanctions* [Doc. 101] as moot without prejudice.

## III. Conclusion

For the foregoing reasons, the Court **GRANTS** Defendant's *Motion for Summary Judgment* as to claims asserted by the Tierra Blanca Ranch High Country Youth Program, **GRANTS** Defendant's *Motion for Summary Judgment* as to Plaintiff Scott Chandler's claim for malicious prosecution, and **DENIES** Defendant's *Motion for Summary Judgment* in all other respects. [Doc. 91]

Furthermore, the Court **DENIES** Plaintiffs' *Rule 56(d) Request for Time to Conduct Discovery* [Doc. 94] and Plaintiffs' *Motion for Sur-Reply* [Doc. 97].

Finally, the Court **DENIES without prejudice** Plaintiffs' *Motion for Spoliation Sanctions against Defendant*. [Doc. 101]

**SO ORDERED this 1st day of June, 2018.**

_____
**M. CHRISTINA ARMIJO**
**United States District Judge**